IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: MALLINCKRODT PLC,<br><br>Reorganized Debtor | Chapter 11<br>Bankr. No. 20-12522 |
| OPIOID MASTER DISBURSEMENT TRUST II,<br><br>*Appellant*,<br><br>v.<br><br>CITADEL SECURITIES LLC, *et al.* | Civ. No. 1:25-cv-00114-SB |

Justin R. Alberto, Patrick J. Reilley, COLE SCHOTZ P.C., Wilmington, Delaware; Kevin C. Maclay, Todd E. Phillips, Jeffrey A. Liesemer, Serafina Concannon, Lucas H. Self, CAPLIN & DRYSDALE, CHARTERED, Washington, D.C.

*Counsel for Appellants.*

Jeremy W. Ryan, Nicole K. Pedi, Gregory J. Flasser, Maria Kotsiras, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael A. Barlow, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Christopher D. Kercher, Benjamin Finestone, Peter H. Fountain, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, N.Y.; Phillip D. Anker, Noah A. Levine, Ross E. Firsenbaum, Michael McGuinness, Austin M. Chavez, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, N.Y.

*Counsel for Appellees.*

**MEMORANDUM OPINION**

November 24, 2025

BIBAS, *Circuit Judge*, sitting by designation.

The opioid crisis is a scourge on our communities. Companies like Mallinckrodt perpetuated the crisis by promoting these drugs. When its business model started to fail, Mallinckrodt artificially inflated its value by buying back its stock. This made its shareholders billions before it sought refuge in Chapter 11 bankruptcy. The Bankruptcy Code lets creditors recoup fraudulently transferred money. But it also shields payments to banks and transfers connected to securities contracts from being clawed back. The bankruptcy court found that hundreds of millions of dollars spent on fraudulent share repurchases by Mallinckrodt are so shielded. Though the *contracts* are void, the *money paid* is real. I adopt its findings and affirm.

## I. An Opioid Kingpin Cashes Out Before Bankruptcy

Mallinckrodt is an Irish pharmaceutical company that started selling opioids in the 19th century. App. 152, 154. But it was not until the 21st century that business got good. Mallinckrodt became the dominant opioid manufacturer in the country. App. 153. In the aughts, it called its opioid business a "new economy." App. 21. And by 2015 it accounted for a quarter of the DEA's annual quota for controlled substances. App. 159. The DEA called it "the kingpin within the drug cartel" because of its size, false marketing, and aggressive tactics. App. 129, 160–61.

Being the largest opioid producer and seller was lucrative. But it came at a cost. And that cost was paid by people and communities from coast to coast. More than 600,000 died from opioids from 2000 to 2020; millions more are addicted. App. 150. Overall, the opioid crisis has cost our country trillions. App. 152, 221.

### A. Mallinckrodt buys back more than a billion dollars of its stock

After a decade-plus of boom, the opioid market went bust. The CDC declared an "opioid epidemic." App. 213. Governments and private parties rushed to the courthouse to redress their huge injuries from Mallinckrodt's bad acts. App. 213–16. By the time Mallinckrodt filed for bankruptcy in 2020, it had "tens of billions of dollars" in liabilities, far outweighing its roughly $3 billion in assets. App. 220–21.

As Mallinckrodt watched the opioid crisis deepen and litigated thousands of cases, its Board hatched a plan to prop up the company's share price. App. 216–17. The Board spent $1.6 billion to buy back outstanding shares from 2015–18. App. 222. This artificially inflated Mallinckrodt's share price even as its core business was in a death spiral. App. 222–24. And the debt-fueled share buybacks only accelerated as losses mounted and sales plunged. App. 227.

The buybacks drove up share value for Mallinckrodt's shareholders, enriching them to the tune of hundreds of millions of dollars. Many of those shareholders are financial institutions: banks, investment managers, and hedge funds. App. 135–49. To buy the shares back on the open market, Mallinckrodt worked with two brokers, Goldman Sachs and Morgan Stanley. App. 1046–47. The outflow of money meant that there was less left over to pay the injured people, companies, and communities who were left holding the bag. App. 134–35, 243–45.

### B. The Trust tries to claw back fraudulent stock buybacks from financial institutions, who in turn seek a safe harbor

After Mallinckrodt declared bankruptcy, all opioid-related claims against it were assigned to a Delaware statutory trust. App. 134; 12 *Del. C.* § 3801. That Trust

3

brought claims to recover money fraudulently transferred out of Mallinckrodt while it was insolvent—including claims that sought to claw back the money Mallinckrodt paid to buy back its shares. App. 128.

Fraudulent transfer is a state-law tort preserved by the Bankruptcy Code. The Code lets the Trust "avoid any transfer of an interest of" Mallinckrodt "that is voidable under applicable law." 11 U.S.C. §544(b)(1). Then, if "a transfer is avoided under section 544," §550(a) lets the Trust recover "the property transferred, or, if the court so orders, the value of such property." §550(a). If "applicable law" renders a transfer "voidable," the Trust can bring that claim on behalf of all creditors. §544(b). The Trust did just that, claiming that Mallinckrodt's creditors are entitled to "avoid the transfers" and "recover the value" transferred. App. 247.

In turn, the firms sought refuge in §546(e)'s safe harbor, which provides that "the trustee may not avoid a transfer that is a … settlement payment … or that is a transfer made … in connection with a securities contract." §546(e); App. 274, 320, 335. They argued that "settlement payment" is broadly defined as the "payment of cash to the dealer by the purchaser" and a "transfer of cash or securities made to complete a securities transaction." App. 277 (quoting *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n*, 878 F.2d 742, 749 (3d Cir. 1989) and *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999), *abrogated in part on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018)).

The Trust countered that §546(e) did not apply at all. App. 357. It reasoned that Irish law governed the share buybacks, and Irish law considers unlawful buybacks by an undercapitalized company "void." App. 358–59. "Void" contracts are "void *ab initio*," so they are "nullities" with "no legal effect." App. 364–65. On that reading, the contracts never legally existed. Thus, the transfers could not have been "settlement payments" because there was no qualifying transaction. App. 362. Nor could they be transfers made "in connection with a securities contract" because there was never "any valid securities contract." App. 365. For support, the Trust relied on the one case to squarely address this issue, *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857 (Bankr. S.D.N.Y. 2005) (*Enron I*).

### C. The bankruptcy court finds for the firms

The bankruptcy judge granted summary judgment for the firms. Section 546(e)'s safe harbor protects a "financial institution" only if it makes a "qualifying transaction." App. 1058. The banks, hedge funds, and money managers are plainly "financial institutions." 11 U.S.C. §546(e); App. 1059–70. The court also concluded that the transfers counted as "qualifying transactions" because they were "settlement payments." App. 1058. As the court recognized, "the Code's definition of 'settlement payment' is 'extremely broad.'" App. 1058 (quoting *Bevill*, 878 F.2d at 752). And it found *Enron I* distinguishable on its facts and doubtful on the law. App. 1056–57. So it held that the safe harbor applied without reaching whether the transfers were made "in connection with a securities contract." App. 1058 n.12 (quoting 11 U.S.C. §546(e)).

The Trust appeals the decision that void transfers could be either settlement payments or transfers under 11 U.S.C. § 546(e). App. 1075; D.I. 24, Appellant's Br. at 13. I have jurisdiction under 28 U.S.C. § 158(a)(1) and review the grant of summary judgment de novo. *Am. Flint Glass Workers Union v. Anchor Resol. Corp.*, 197 F.3d 76, 80 (3d Cir. 1999).

## II. THE BANKRUPTCY CODE PROTECTS FAILED SETTLEMENT PAYMENTS

Whether void payments are protected by § 546(e)'s safe harbor has come before a court only one other time. *See Enron I*, 323 B.R. at 870. That court held that void payments are not "settlement payments," so financial institutions cannot take refuge in the safe harbor. *Id.* But that single decision neither binds nor persuades me, so I affirm the bankruptcy court.

### A. Settlement payments are any payments made to complete an intended transaction

Reading Congress' definition of "settlement payment" is like stepping into a house of mirrors; fragments are repeated over and over with dizzying effect. The result is an "extremely broad definition" that encompasses payments made without a final effective transfer: "'Settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." *Bevill*, 878 F.2d at 751 (first quotation); 11 U.S.C. § 741(8) (second quotation).

The circular definition underscores that "settlement payment" refers to any part of the settlement process. In the Third Circuit's canonical interpretation, that meant

6

that a settlement payment "may be the deposit of cash by the purchaser or the deposit or transfer of the securities by the dealer." *Bevill*, 878 F.2d at 752. So "[d]elivery of the securities," even disconnected from the payment, was "part of the settlement process" and sufficed. *Id.*

A payment alone is enough, even if the transaction does not ultimately settle. *See In re Resorts*, 181 F.3d at 515 ("In the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction."). Of course, ultimate settlement is the goal of any transaction. But even "partial" or "interim" payments count as "settlement payments." 11 U.S.C. § 741(8). Ditto for payments that never "travel through the settlement system." *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l. Corp.)*, 590 F.3d 252, 258 (3d Cir. 2009).

This is true even if there was never any chance of completing the transaction. In the bankruptcy litigation stemming from Bernie Madoff's Ponzi scheme, the Second Circuit held that client payments from the Ponzi scheme were "settlement payment[s]" because they were "intended" to facilitate a securities transaction. *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 422–23 (2d Cir. 2014). The clients thought they were telling Madoff's company to sell securities on their behalf. In reality, nothing was happening: There were no transactions to settle, and Madoff was just moving money from checking account to checking account. *Id.* at 415, 423. But even though there were never any securities transactions (let alone valid ones), the client's expectation that there were

such transactions combined with the legitimate relationship between seller and broker made the transfers settlement payments. *Id.* at 422–23.

*Madoff* looks like this case. Mallinckrodt hatched a fraudulent plan to buy back stock without enough funds. App. 1055. Brokers connected Mallinckrodt to financial institutions who received money transfers in exchange for their shares. App. 135, 223. The underlying transactions appear to have been void *ab initio* under Irish law. But the payments are very real, and they were made to complete a securities transaction. That satisfies §546(e) here as it did in *Madoff*.

**B. Payments under void contracts can still be settlement payments**

The Trust's creative counterargument mostly rests on *Enron I*. In that two-decade old bankruptcy court decision, the fraudulent transfers were governed by Oregon law, which considered the transactions "illegal and void." 323 B.R. at 871. The bankruptcy court reasoned that "the transaction is void and there is no settlement obligation to discharge nor any securities transaction to complete." *Id.* at 876. Without "a valid underlying securities transaction" there can be no "settlement payment." *Id.* at 877.

*Enron I* stands alone and on shaky ground. For starters, its holding was partly based on the theory that settlement payments must be "commonly used" in the industry to receive protection. *Id.* at 877 & n.9. But the Second Circuit rejected that interpretation six years after *Enron I* was decided, underscoring the "breadth of the §546(e) exemption," and noting that "we find little support for the contention that a securities transaction necessarily involves a purchase or sale" or any comparably common action. *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 336–37 (2d Cir. 2011) (*Enron II*). Another opinion cited by the Trust relies on the

8

same reasoning that *Enron II* repudiated. *See Cooper v. Centar Invs. Asia Ltd. (In re TriGem Am. Corp.)*, 431 B.R. 855, 866 (Bankr. C.D. Cal. 2010) (holding that an illegal swap was "outside of the protection of the statute because it was not the same or similar to anything commonly used in the securities trade").

*Enron I*'s reasoning also relies on a simplistic distinction between void and voidable transactions. Fraudulent transfers are typically voidable contracts. *See Kaliner v. Load Rite Trailers, Inc. (In re Sverica Acquisition Corp., Inc.)*, 179 B.R. 457, 473 (Bankr. E.D. Pa. 1995). That means that the agreements remain in force until the aggrieved party acts to "avoid" them—have them declared "null" and "of no legal effect." *Void, Black's Law Dictionary* (12th ed. 2024). But some contracts are "void" or "void *ab initio*." They are "[n]ull from the beginning" and are "of no effect whatsoever" without "the election of one party to the contract." *Id.*

Void contracts have no legal effect, but they do not become invisible. Courts can "see" them if a defrauded party brings a rescission claim to get back money given in consideration of a void contract. *See Shadis v. Beal*, 685 F.2d 824, 826 (3d Cir. 1982) (weighing a contract against the public policy of the state to find that it was illegal and void). A court can still look to the terms of the original agreement and the actions that flowed from it, because even though a void contract "is not a contract at all," it is still a "promise" or "agreement." Restatement (Second) of Contracts § 7 cmt. a.

For contracts void *ab initio*, the law "neither gives a remedy nor otherwise recognizes any duty of performance." 1 Williston on Contracts § 1:20 (4th ed. 2025). But the firms are not asking the court for a remedy or to recognize a duty of

9

performance. Instead, they are seeking to bar the Trust from clawing back payments that Mallinckrodt already made—real payments of real dollars in exchange for real stock shares. Appellee's Br. 19. True, the contracts underlying the transaction are "nonexistent." *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 101 (3d Cir. 2000). But the settlement payments are not.

The Trust replies that, even if there were "payments," there can be no "settlement" because the underlying obligation to pay never existed. Reply Br. 10, 17. It is true that Mallinckrodt had no legal obligation to pay under contracts that were void *ab initio*. But Mallinckrodt's still made payments to fulfill a purported obligation. That is all that the safe harbor requires. In *Bevill*, the Third Circuit held that a transfer of securities in a repo transaction, even without an accompanying payment, counted for § 546(e). 878 F.2d at 752. *Madoff* is the mirror image of *Bevill*, where payments unconnected to any securities transactions were nonetheless "settlement payments." 773 F.3d at 471. Thus, payments made to settle securities transactions of all stripes count as settlement payments.

It makes little sense to distinguish, as *Enron I* did, between void and voidable fraudulent transfers. The line between what is void and what is voidable looks less like the Berlin Wall and more like the borders within the Schengen Area. For instance, "void" can sometimes refer to "voidable" contracts. *Atl. Coast Line R. v. Florida*, 295 U.S. 301, 311 (1935). The overlap is especially stark with fraudulent transfers, which equity treated as voidable and law treated as void *ab initio*. David G. Carlson, *Fraudulent Transfers: Void and Voidable*, 29 Am. Bankr. Inst. L. Rev. 1,

10

4, 81 (2021) ("At present, it is impossible to say whether fraudulent transfers are void *or* voidable. One must admit they are void *and* voidable."). Reading this distinction between the two terms into otherwise plain text is unwarranted.

What is more, federal law routinely considers void documents, even if they are a legal nullity. For example, contracts "void *ab initio*" under state law can count as enforceable "contracts" under the Federal Arbitration Act. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 (2006) (holding that the Act enforces arbitration provisions in void contracts just as in voidable ones). Or consider the Brooks Act of 1965, which regulated government contracts for computer equipment. Pub. L. No. 89-306. Its "saving provision" protected "all goods or services delivered and accepted under the contract" even if the contract "would be void *ab initio*." *United States v. Amdahl Corp.*, 786 F.2d 387, 390, 396 (Fed. Cir. 1986). And *Rooker-Feldman* protects "void *ab initio*" state court judgments from federal-court review. *Knapper v. Bankers Trust Co. (In re Knapper)*, 407 F.3d 573, 581 & n.16 (3d Cir. 2005).

Section 546(e)'s safe harbor works the same way. For example, California law historically treated fraudulent transfers as void, not voidable. *See* Cal. Civ. Code § 3439.04 (1986); *Daff v. Wallace (In re Cass)*, 476 B.R. 602, 614 (Bankr. C.D. Cal. 2012), *aff'd*, 606 F. App'x 318 (9th Cir. 2015) (unpub.). But § 546(e) still applied to "settlement payments" alleged to be unlawful under California's Uniform Fraudulent Transfer Act. *Wyle v. Howard, Weil, Labouisse, Freidrichs Inc. (In re Hamilton Taft & Co.)*, 114 F.3d 991, 993 (9th Cir. 1997). The text is broad enough to cover the transactions.

11

**C. Any other reading would subvert the Trust's case and the Code**

The Trust's reasoning puts the cart before the horse. Section 544(b) lets the trustee assert the rights of unsecured creditors to "avoid" transfers and recover their value. 11 U.S.C. §§ 544(b), 550(a). That whole process is subject to the § 546(e) safe harbor, which operates independently of either provision to insulate financial institutions: Even if their transfers are otherwise void under § 544(b) and "applicable law," they "may not avoid" them. § 546(e). The entire scheme is set up to determine whether transfers ought to be considered void. The Trust seeks an off ramp—a judicial determination that the transaction is already void. But that judgment is reserved for the end of the process, and does not occur sometime between § 544(b) and § 546(e).

If the Trust were right that voidness under Irish law stops the operation of the Bankruptcy Code, it would defeat the Trust's whole claim. Section 544(b)(1) applies only to contracts that "may be avoided." § 544(b). Only voidable contracts "may be avoided." Charles Jordan Tabb, Kara J. Bruce, & Laura Napoli Coordes, Law of Bankruptcy § 6.1 at 490 (6th ed. 2025) ("A transfer that is subject to one of the avoiding powers is not void, but is only voidable."); 5 Collier on Bankruptcy § 544.01 (16th ed. 2025) ("It is generally thought that section 544 is limited to avoidance actions."); *see also* 1 Williston on Contracts § 3:6 ("When a contract is 'voidable' as the result of an invalidating cause, it nevertheless remains valid and enforceable unless and until the party entitled to avoid the obligation exercises that right."). So the trustee has power to "avoid certain transfers that would be 'voidable under applicable

12

law'—that is, voidable outside of bankruptcy proceedings." *United States v. Miller*, 604 U.S. 518, 522 (2025) (quoting 11 U.S.C. §544(b)(1)).

But there is no need to "avoid" void contracts; they are already void without any party or court acting. Restatement (Second) of Contracts § 7 & cmt. a. For void contracts, a party brings an action for a "declaratory judgment that the contracts … were void." *Fla. Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 680 n.11 (1982). Then "the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against continued operation of the contract, and for restitution." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979). So if the transactions at issue in this case were truly void as the Trust claims, §544(b)'s avoidance power would be unavailable.

Adopting the Trust's reading would make a hash of the Code. The relevant exception to the safe harbor is the one that Congress included: "except under section 548(a)(1)(A)." §546(e). That provision covers transfers made with "actual intent to hinder, delay, or defraud." §548(a)(1)(A). The Trust alleges "actual intent to hinder, delay, or defraud." App. 245–46. But it does not bring its claims under §548(a)(1)(A), perhaps because transfers fell outside that section's two-year reach-back period. App. 335 n.3. Instead, it seeks to create a new exception. The bankruptcy court rightly rejected that strategy as contrary to text, statutory structure, and precedent.

### D. Plus, the transfers are shielded because they were made in connection with a securities contract

The bankruptcy court did not pass on whether the transfers are also protected by §546(e) as "transfers made … in connection with a securities contract." App. 1058–59

13

n.12. This "only requires that a covered transfer be broadly related to a 'securities contract.'" *Madoff*, 773 F.3d at 420. They are.

The Code separately defines "securities contract" as "any other agreement or transaction that is similar to" a securities contract. § 741(7)(A)(vii). The relationship between the agreement and the transfers at issue must be "clear from the face of the Trustee's Complaint" to take advantage of the safe harbor. *Miller v. Black Diamond Cap. Mgmt. (In re Bayou Steel BD Holdings, L.L.C.)*, 642 B.R. 371, 390 (Bankr. D. Del. 2022)

The amended complaint sets out a set of contracts made "in connection" with the transfers. "Mallinckrodt," it says, "entered into a series of contracts ('Purchase Agreements') with two brokers in connection with the share repurchases." App. 223. Pursuant to these purchase agreements, the brokers executed the buybacks that the Trust now seeks to unwind. *Id.*

The buyback agreements fit the bill. The agreements let the brokers buy back the shares, but they are not themselves the buybacks that the Trust urges are void. *See id.*; *contra* Reply Br. at 30. So the transfers were "made by or to (or for the benefit of) a … financial institution … in connection with a securities contract." § 546(e).

\* \* \* \* \*

Citizens and communities harmed by opioids deserve payment. The Bankruptcy Code balances creditors' needs, debtors' desires, and systemic stability. Here, that balances tips in favor of the financial firms. The Trust must continue pursuing compensation elsewhere.